Thank you. You may be seated. The final case for today is case number 414-0578, and that is the people of the state of Illinois v. Mansour Shakirov. For the appellant, we have Mr. Kimmel, and for the appellee, we have Mr. Zimmerman. You may proceed, counsel. May it please the court, counsel, I'm Darren Kimmel, and on behalf of the state appellate defender, I represent Mansour Shakirov. The accident on the dark, icy winter road in this case was a nightmare scenario for any emergency responder and also for any driver. And yet, it seems almost inevitable now that it happened here, given the chain of events leading up to it. What was not inevitable was that Mr. Shakirov would be convicted of a crime. The case put on against him was underwhelming and full of errors. We've asked for three alternative remedies, outright reversal for reasonable doubt, reversal and remand for a new trial for the trial errors, or reduction of the class 2 felony to a class 3 felony. So first, the evidence at trial was insufficient to prove Mr. Shakirov acted recklessly beyond a reasonable doubt. The key language is that the evidence failed to prove conscious disregard of a substantial risk of great bodily harm. This accident was foreseeable by the fire department. We know that because of the dash cam videotape by Trooper Parnell on which the fire department personnel discussed sending the Tahoe a mile ahead on the southbound interstate to make sure to warn drivers to slow down and get over in the right lane ahead of this unforeseen danger of the icy conditions and the bottleneck created by the fire department directly blocking the left lane of southbound traffic. Mr. Shakirov then had the great misfortune to be the first driver to approach this scene who did not have the benefit of that buffer zone, that advance warning of the Tahoe and the four firemen standing outside of it a mile ahead of this unforeseen danger directing traffic to slow down and get over. They took the Tahoe away from that station before the danger of that bottleneck had passed. And then this tragedy ensued. Two big trucks had already slid off the icy highway in the same location into the ditch earlier that night. That's the reason the emergency responders were there in the first place. And we can hear the emergency responders on that video I just mentioned discussing these terrible road conditions in real time, discussing how slick the road was. And Trooper Parnell testified that those conditions were deceptive, that the high winds had blown the snow off the roadway for the most part there, leaving black ice that was hard to see. That's what makes it unforeseen. That's where this conscious disregard comes into play, why that's so problematic. And that makes this case look quite a bit like the Wall Jasper case, where the 3rd District held that a driver was not reckless for losing control on a patch of unforeseen ice, where a car had earlier had the same thing happen. A first car slid off the road, a second car came along and slid off the road and hit a pedestrian that was responding to that first accident. This case looks quite a bit like that. The key difference, as the State has pointed out, is that there were emergency responders on the scene in this case. And that is a factual difference, that there were emergency lights present at the scene when Mr. Shakarov approached. But the evidence presented at trial here, taken together, supports a reasonable conclusion that Mr. Shakarov acted responsibly when he first saw those lights, that he slowed down as he approached the scene. The problem is that, as you can see from the video, although you can see the lights from a ways away, you would have had to drive fairly close to be able to make out where on the roadway the emergency vehicles were located. And though you can see emergency lights in general from a great distance, you would have to drive quite close before you could make out the narrow strip of yellow directional lights telling drivers to move over to the right. This is not like at a construction zone where you have the very large yellow arrows. This is a very small strip of yellow lights. And you cannot discern, as you can see from the video, you cannot discern that signal telling you to move over from the greater swath of emergency lights, reflections, and headlights that would have appeared to a southbound driver. The juror that wrote to the sentencing judge described it as a carnival of lights amidst blowing snow. And that's what would have confronted Mr. Shacharoff. But the evidence supports this reasonable interpretation that he did slow down. He told the police afterwards that he had been going not more than 50 miles per hour initially. And the state's experts came to the conclusion that he could have been going as slowly as 37, just a bit over 37 miles per hour at the moment of impact. That supports the conclusion that he did, in fact, slow down. But by the time he got close enough to realize that he was in the wrong lane, that he was in the left lane, it may have been too late. He also told the police that when he tried to brake, he lost control. The truck slid forward. This enormous truck slid forward on the ice. And this tragedy occurred. We pointed out a number of problems with the state's experts providing that 37-mile-per-hour figure that indicate that that number actually should have been somewhat lower. The problem of the friction coefficient would lower that number even further to 32 miles per hour. And the fact that they had improperly weighed the truck, that the weight estimate they were using for the truck didn't account for a car that had already been unloaded from the truck, an elemental mistake would have further decreased that number. 30 miles per hour on a highway is not very fast. But for the ice, that would have been a reasonable response to seeing those lights. But when you get too close, even going 30 miles per hour, you aggressively brake and lose control, there's not much you can do. The state has also talked about the fact that Mr. Shakarov didn't change lanes. He didn't even signal that he was going to change lanes. But in that situation, if he thought he had moved over correctly and that the emergency vehicles were on the right side of the road instead of the left where they actually were, at that point where he lost control on trying to brake, it may have been the best choice available to him in that situation. Instead of trying to turn with no traction, which might have caused the truck to jackknife and caused further loss of life. The fact that this decision he made did not work, that he still crashed into the vehicles, does not make that an unreasonable decision. It might have been the best choice available from a range of bad options. I can't emphasize enough how important watching the video is to understand this case. It shows how hard it would have been to make out these different facts until you're very close. And that Mr. Shakarov might not have realized until it was too late that he was in the wrong lane. I'll just highlight that Mr. Shakarov needed the advance warning of his buffer zone more than anyone else on the road that day. He was driving an enormous semi-truck, what the responders called the biggest truck many of them had ever seen. Some of them referred to it as looking like the Titanic coming at them. He, of all people, needed advance warning to be able to slow down in time to avoid this crash. And this was a tragedy. A good man died and everyone involved in this incident will have to live with that for the rest of their lives. There's reasonable doubt here and we ask that you reverse outright. Turning to the second argument, a new trial is required for two specific errors that occurred at trial. But for either of these errors, a reasonable probability exists that the outcome would have been different. We've also argued that the cumulative error, the combination of the two errors and the alternative, should require a new trial. So the first is this technical 14-hour rule violation that occurred on the day before the accident at issue here. Mr. Shakarov took extra off-duty time in the middle of his day of driving. Now, I've asked the State for an explanation of how that would have made him more tired than driving the exact same amount of time straight through without a break, which would not have been a violation of any rule. But instead, he took this break in the middle of the day. I still don't understand how that would make a person more tired than driving straight through. It's irrelevant to the issue of whether he was tired the following day. It is unconnected from that issue. But it does paint Mr. Shakarov as a rule-breaker and it's very prejudicial. It's the only piece of evidence that took the jury or purported to take the jury inside the cab of Mr. Shakarov's truck. Everything else was circumstantial about this truck's speed, about noises the truck made. This is the only piece of evidence that purports to tell us Mr. Shakarov's state of mind, what he was thinking, whether he was sleepy or not. But it doesn't actually help us make that decision. It wouldn't have helped the jury make that decision, but it would be extremely prejudicial. He also had ten and a half hours in the sleeper berth that night after that day of driving and an additional time off duty before starting the day of driving at issue in this case. This evidence should not have been allowed in. And it by itself created a reasonable probability of changing the outcome of this case. Because again, it's the only evidence that goes inside the cab and that's problematic. The second error was the testimony on an alleged Scots law violation, a misdemeanor offense that was not presented at trial, but the state worked into the reckless homicide offense that they did charge and prosecute here. Now this essentially was misdirection by the prosecution that could have confused the jury. It added nothing of help to the jury. It in no way helped the jury, including this evidence. It did not help the jury in any way to decide whether or not Mr. Shacharov added recklessly. But it did create the risk of confusing the jury, especially since the testimony by Lieutenant Hoop on this Scots law violation seemed to create the implication that it was a strict liability offense, that the mere fact that this accident occurred, that the outcome occurred, was automatically a Scots law violation, as he testified, because Mr. Shacharov did not get over the outcome and did not slow down the outcome, removing mens rea from the equation. If the jury accepted that, it would bootstrap recklessness onto a lesser misdemeanor that was never charged. It adds only prejudice to the case and doesn't help the jury do its job in any meaningful way. Now either one of these errors alone creates this reasonable probability of changing the outcome. We've also argued in the alternative that the two together, cumulatively, would provide the grounds for this Court to reverse and remand for a new trial. Third, on the Apprendi argument, this Court should alternatively reduce the Class II felony to a Class III felony for this clear Apprendi violation. The State has conceded that an Apprendi violation did occur here. They have contested whether it's harmless beyond a reasonable doubt. If the jury decided here that Mr. Shacharov was simply going too fast, the first prong of the State's argument, and couldn't change lanes because of these conditions, then they also could have decided that he was only guilty of a Class III felony and not a Class II felony. I think in addition to the general case supporting that conclusion, this Court can also look to the anguished juror's letter to the Sentencing Court, stating not only that she regretted her vote to convict Mr. Shacharov, but that she believed he was doing the best he could in a terrible situation. I think the essence of that supports a conclusion that that juror and a reasonable jury could have voted for a Class III felony if they did vote to convict Mr. Shacharov. If there's no questions from the panel... I don't see any, Counsel. Thank you. You'll have time on rebuttal if you so desire. Thank you, Your Honor. Mr. Zimmerman. May it please the Court, Counsel. Good afternoon, Your Honors. My name is John Zimmerman. I'm from the Fourth District Appellate Prosecutor's Office on behalf of the State. Although Counsel just did a great job of presenting the facts in the light most favorable to the defendant, as Your Honors are aware, that is not the standard of review when it comes to sufficiency of the evidence. Here, the facts in the light most favorable to the State are as follows. The defendant drove a semi weighing over 70,000 pounds in precarious winter conditions, somewhat similar to today, at a speed not more than 50 miles per hour, which, as Counsel stated, this was the defendant's own words immediately after the crash. And then he crashed into a group of clearly visible emergency responders and ultimately killed one. His failure to slow down, his failure to move into the unobstructed lane, his failure to take any action attempting to warn the responders, such as honking his horn or turning on his hazards, or even braking, evidenced his recklessness. Moreover... So is it your position that basically the record just shows he just plowed through here, no intention of stopping, no attempt to stop, just drove through? Your Honor, I feel an accumulation of the facts through direct testimony of some of the witnesses and some circumstantial evidence, such as the logbook violation. And, in fact, when did he start stopping? If he even did, I feel like that shows that he did somewhat just plow through. Let's talk about that logbook violation. Do you agree with opposing counsel that he basically took a break in between driving where he could have just continued driving? It's a 14-hour violation, right? And so the evidence was from the logbook that he, instead of driving the straight 14 hours, he took a break, which took him technically over the 14 hours, but there were, what was it, three and a half hours or something around that time the break was that he took? Yes. So I don't understand how that means he would have been tired or more tired. Yes, Your Honor. The logbook violations are somewhat complex. I believe the 14-hour rule requires that once the driver begins driving, he cannot drive after that 14 hours. Now, I believe he can only, he's only legally allowed to drive within that 14-hour period, 11 hours. He stopped at 10 and a half hours, but basically, in this case, he was supposed to stop driving at 9.30. Yes, he took a break in the middle of the day. I'm not sure if he was resting or what he was doing. Maybe he was just eating some food. But we know that he did not drive in total past the total number of hours he can drive in a day, right? There's a difference between the 14-hour rule and the number of hours within a 24-hour period that the person can be driving. That's 11, is it right? Is that right? I believe that's correct. So he didn't drive in excess of 11 hours in the 24-hour period prior to the accident, right? I would have to do the math on that, but basically what he did here, he started at 7.30 on page 13 of my brief. I chart this out. He started at 7.30 on the day before the crash, and he should have ended at 9.30. But how much of a break did he have in between? Was it three or four hours? He continued to drive until 12 a.m. that night. But did he exceed the maximum number of hours he is allowed to drive, literally drive? 11, which would be 11. I cannot answer that just upon my own recollection. But I believe this is still highly relevant evidence. Regardless of whether he drives how many hours he's supposed to, he was up from 7.30 until 12 a.m. And yes, maybe he was in the sleeper berth for 10.5 hours the following day, but just because you're in the sleeper berth doesn't mean you're sleeping. You could be reading a book or on your phone. So by your logic, it's going to be relevant in any case where a truck driver is in an accident. It's going to be relevant that they may be tired, because just because they chart sleeping time, we don't know if they were sleeping or not, right? Well, I'm not going to say exactly your proposition, Your Honor, but I think in this case, with certain circumstances, there was in fact a violation. And I think that is what's relevant and why this issue was so thoroughly litigated. If you review the record, this was discussed in various pretrial proceedings. The trial court didn't even allow it in until an expert testified outside of the presence of the jury about why this was an important violation and how it was possibly relevant. And how was it relevant? Because it showed that he was possibly tired from his full day of staying up. He was up from 7.30 until 12 a.m. the previous day. If anyone's up for that many hours, I feel like that could possibly affect your thinking. Even if you get 10.5 hours of sleep time in between, after that? Possibly. I'm not certain. But the trial court said that there were several witnesses during the cursive trial who testified the vehicle did not slow or change ranges or take any evasive maneuvers, even though there were lights on the scene. The fact that the arrows indicating move to the right and he didn't was not done. This creates some thought in the court's mind as to what potentially was going on with regard to the defendant. Whether there was a lack of function, whether there was some sort of sleeping with regard to what was going on as he was approaching the accident scene and why the left lane was not yielded into the right lane. I thought he told the police that he saw the lights and he thought that the emergency vehicles were in the right lane so he moved into the left lane to try to avoid them. I believe his statements were similar to that. But again, on appeal, we're looking at the light most favorable to the state when looking at the evidence. Obviously the defendant's statements are not the evidence that's most favorable. In fact, multiple witnesses testified that the scene was visible from miles away. So if you believe his testimony that he saw the lights and stepped on the brakes before he then moved into the lane, that meant he slid for numerous miles, that doesn't seem like a logical or credible account on his part. And defense counsel discusses the buffer zone as the state put forth in its brief. The very first responder on the scene was able to conduct traffic, just a single, I believe, squad car appropriately in southbound and northbound. So the cars were noticing the lights and slowing down. And I believe counsel said defendant's truck was the last vehicle to, or was the only vehicle without the buffer zone. But I'm not sure if that's an accurate statement. I believe the car moved up and then several other vehicles went through after the buffer zone came up. I think the defendant argued that they had the guidance of the Tahoe buffer truck as they were going back. I'm not sure how accurate that fact is. And another issue regarding the snipe that defense counsel did not hit upon regarding the definition of reckless is that it was an unjustifiable risk, conscious disregard, where such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in this situation. If you look at the video, if you look at all the testimony, every other vehicle responded appropriately to the first responders, whether there was a single car on scene, whether there was the ambulance and multiple other squad cars. They all slowed down, acted appropriately, and did not crash into the scene, unlike defendant did. Is there testimony about why the fire truck and the SUV parked in the left lane of traffic? Yes, Your Honor. As opposed to the shoulder? Yes. Because Parnelly had no trouble parking on the shoulder. So it was a two-lane southbound interstate, and the accident was on the, I believe, the inside. And the ambulance, the first, the initial squad car arrived, directed traffic, then the ambulance arrived, and they had to be partially in that left lane to do their job. So the ambulance was gone by the time the accident occurred, isn't that true? I'm not too aware of that fact, but I know that there was testimony, let's say, that the fire truck parked in a blocking position in order, if there was, let's say, a smaller car that ran into it, it would protect the crash scene and the first responders who were on it. So there was the fire truck kind of parking at an angle to block, protect the scene, and then there was another truck, and they were kind of like blocking the scene. It was like a protection plan. And so that's why the lane was obstructed, because it needed to be obstructed in order to take care of the scene. And defendant likens this case to the Wall Jasper case, and he does note that there were no emergency responders there. In Wall Jasper, a car slipped on a patch of ice and slid off the road. Later, another car slipped off the exact same patch of ice and then ended up killing someone. And on appeal, the court reversed it because it said it was an unforeseen patch of ice. Here, that is totally not the case. There were the emergency responders who were showing the foreseeability of the danger of the ice patch. And so for defendant to say that he stopped on his brakes as soon as he saw the lights and slid without any control just does not make sense because they were visible forever. So you're saying he should have known from the lights that the road was slick? He should have known there was a foreseeable danger up ahead, hence all the emergency lights. And defendant also argues that because he could not tell which lane was unobstructed, that shows he was not reckless. But if you can't tell which lane is unobstructed, you wouldn't keep going 50 miles per hour on the interstate. You'd slow down until you can tell what lane is unobstructed, just like every other car did on that night. So he's the only one being reckless. It was a conscious disregard that was a gross deviation from the standard of care that all the other vehicles were using that night. So we should disregard the estimate that your expert came up with as far as his travel, how fast he was going? The state's position would not be for you to disregard it, but just weigh it as the jury did against defendant's testimony that he was going not more than 50 miles per hour. The statement from defendant was immediately after the crash. There were first responders trying to resuscitate the individual who ultimately died, and they immediately went and talked to defendant and asked him how fast he was going. Not more than 50 miles per hour. Around 50, I feel like that's the common interpretation of that statement. Especially when you're being asked immediately after you hurled multiple vehicles 50 to 60 plus feet down the road, if you're asked how fast were you going, it's not the conclusion that appellate counsel argued that that's how fast he was going early. It's how fast he was going when he crashed into the scene. It's an excited utterance immediately after he threw an individual 60 plus feet. I don't see how that can be interpreted to mean that's how fast he was going, and then he slowed down once he saw the lights. Because obviously first responders even testified there were no hazards, there were no blinkers, there was no sounds of braking, there was no horns. You would think if you were losing control of your car crashing into a scene, you would be laying on the horn or trying to notify these people that you're impendingly going to crash into them. I just feel like the evidence at trial was overwhelming, hence the guilty verdict. And on appeal, when you have to view this evidence in the light most favorable to the state, it's just a burden that defendant has failed to overcome. And regarding the prejudicial errors such as the logbook and Scott's law, as we previously discussed, the state's position is that it's not an abuse of discretion. The logbook violation was relevant to show whether there was circumstantial evidence as to why defendant may be tired, maybe why he wasn't attentive, why didn't he step on the brakes, why didn't he warn these people, was he on a cell phone, was he taking a nap while driving? Appellate counsel even just argued that this evidence may have shown he was not tired, as your Honor noted. So simply because it could show that he was tired and that it could also show that he was not tired, that's not unfairly prejudicial. Of course, it's slightly prejudicial, but that's not unfair prejudice. The jury could have easily seen that, oh, look, he did get ten and a half hours of sleep after this, so we're not going to factor that into our verdict. And further, as I said, sleep or birth does not mean he was sleeping. So the state's position as to the logbooks is that they are relevant, and the probative value substantially outweighed any unfair prejudice. The Scott's law violation, similar to the logbook, the trial court explicitly discussed and analyzed the admissibility of this violation. The witness, Hoop, was an expert in the field of crash reconstructionists. He was also testifying as an investigator of the scene that evening. He said he made contact with the defendant. He received information from the defendant, such as the driver's license, the logbooks, truck paperwork, insurance, etc. And him testifying that he then issued him a citation for failing to yield to the scene is simply another portion of his testimony regarding his investigation, which testimony from investigators discussing the procedure of their investigation is admissible and relevant to allow the jury. Was there a violation of Scott's law? The way the statutes worded how they said the defendant needed to get into a nonadjacent lane, that was somewhat confusing, Your Honor. The only lane available is an adjacent lane. Correct. The state's position on that would be the shoulder should be considered a lane, so possibly go out on the shoulder.  I'm not so sure if that statute has been litigated as to whether the adjacent lane, nonadjacent lane. Does the statute also talk about if you're able to do so or if it's reasonably safe to do so? Is that also something to be considered? Yes, that is also something to be considered, Your Honor. Additionally, regarding the judge elevating defendant's sentence to a Class 2 felony, the state's position, although this is error, it's harmless error beyond a reasonable doubt because clearly defendant did not comply with the traffic control device. I don't think that is really a contested fact. There were traffic control devices telling him going left lane to right lane. He hit them. That's not, that's a lack of compliance. So I believe that was easily allowed to be found beyond a reasonable doubt and that it was harmless error for the trial court to elevate that to a Class 2 felony. And if there are no further questions, the state rests. Thank you, Counsel. Any rebuttal? May it please the Court. Just to answer Your Honor's question about the logbook issues, the time spent driving or off-duty on the day before the day of the issues in this case. Everything is found in People's Exhibit 38, which is the chart that was admitted in evidence. Mr. Shakarov took four and a half hours of off-duty time in the middle of his day of driving. And I would just point out there are two drivers in this truck taking turns. So typically when Mr. Shakarov is not driving, his partner is driving. They're trying to drive these cars cross-country. So four and a half hours in the middle of the day where he's off-duty a block of time. That follows three and a half hours of driving in the morning and then 7.25 hours of driving after those four and a half hours off-duty. To add up those two numbers comes to ten and three-quarters hours of driving. As Your Honor noted, that is under the 11-hour rule that you can only drive for 11 hours in a day. I would note that counsel for the State never answered Your Honor's question on how that would make someone more tired than driving straight through, which would not have been a violation of any of the rules. And that is the same question I have consistently raised in the briefs that brings me to the conclusion, since no one can answer that question to my satisfaction at the trial level, but we're now on appeal, that brings me to the conclusion that this evidence was irrelevant to the issues of this case. And as I noted, it paints Mr. Shakarov as a rule breaker, which I'm sure the prosecution wanted to do to color this case. But that's prejudicial and it should not have happened. And it creates a probability that the outcome would have been different, but for that error. Now, in reasonable doubt, the State's argument, as Your Honor noted, ignores its own evidence of the minimum speed estimate provided by the experts. The State relies on the statement by Mr. Shakarov that he was going not more than 50 miles per hour, to the exclusion of this other evidence, which this Court, even taking all the evidence in the light most reasonable to the State, still has to look at all of the evidence, just as the jury did. And that 37 mile per hour figure is problematic for this idea that Mr. Shakarov didn't slow down at all. The jury had to look at that evidence, that he may well have slowed down. And that brings me to the conclusion that he was trying to react responsibly to seeing those emergency lights, but the unforeseen ice caused him to lose control. I would note that this is the first time that the State has raised the argument that Mr. Shakarov might not have been the driver that confronted the lack of a buffer zone, that everyone else had the buffer zone, and he was the first not to have the buffer zone. The State notably did not raise that argument in its brief, and I would say conceding that issue. I have noted that if you look at the tape, you can see the moment when the Tahoe moves up, because a fireman walks into the camera from the right side of the camera, from the middle of the interstate. The only place he could have been coming from is the Tahoe. And the State's correct that a car and a truck, two vehicles, go through the zone immediately after that happens. Those two cars would have not only been able to follow each other through and see where to go, they would have had the benefit of seeing the Tahoe slowly move up to the crash scene, something that Mr. Shakarov was not able to see. Your Honor asked a question about why the fire engine was parked directly in the roadway of I-39. There is testimony from, I believe, the driver of the fire truck that he was worried about the icy conditions, that the shoulder was covered in ice, there was ice in the roadway, and he was afraid if he parked on the shoulder, that that fire truck would slide off into the ditch, just like the two large trucks had already done that night. These conditions were terrible. Every single person to testify that was there in real time at the time of the accident testified to the slick, icy conditions. Only the State expert that arrived three hours after the accident tried to assert that it was slushy or that it wasn't that slick. Everyone who was there said that it was extremely slick and icy. The State also mentions that Mr. Shakarov didn't do anything to warn the emergency responders, and I share the belief that that's unfortunate. I'm sure Mr. Shakarov also shares that belief that if he could do it over again, he might try to do something like that. But losing control of this enormous truck on the ice and trying to do his best to stop, it's not unreasonable that he had to keep both hands on the steering wheel to try to stop the truck. And as I noted, the fact that that didn't happen, that it didn't work out well in the end, and this tragedy ensued, doesn't make any of his actions reckless. Thank you, Your Honors. Thank you. We'll take this matter under advisement and be in recess.